**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KENNETH DICKERSON, | |
| *Plaintiff*, | |
| v. | Civil Action No. 09-2213 (PLF) |
| DISTRICT OF COLUMBIA, | |
| *Defendant*. | |

**DEFENDANT'S MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 1

    I.    The No Child Left Behind Act ........................................................................ 1

    II.    School Restructuring in the District of Columbia ..................................... 3

    III.    The Non-Reappointment of Kenneth Dickerson ........................................ 6

    IV.    Procedural History............................................................................................ 8

LEGAL STANDARD ................................................................................................... 9

ARGUMENT ................................................................................................................. 9

    I.    Plaintiff Cannot Show a Violation of Section 1981. .................................. 9

        A.    The District Had a Legitimate, Non-Discriminatory Reason for Plaintiff's Non-Reappointment. ........................................................................................... 11

        B.    No Reasonable Juror Could Find Plaintiff Was Non-Reappointed Because of His Race. ...................................................................................................... 14

    II.    Plaintiff Cannot Show a Violation of Section 1983 Because He Cannot Show Former Chancellor Rhee Had a Policy of Replacing African-American Administrators With Non-African-American Administrators. ........................... 18

CONCLUSION............................................................................................................. 20

## INTRODUCTION

In June 2008, after serving by appointment as Assistant Principal at Wilson Senior High School for eight years, plaintiff Kenneth Dickerson was not reappointed to his position for the 2008-2009 school year. Plaintiff alleges that the District of Columbia (the District), acting through its then-Chancellor of District of Columbia Public Schools (DCPS), Michelle Rhee, chose not to reappoint him because of his race, in violation of 42 U.S.C. §§ 1981 and 1983. The District is entitled to summary judgment because plaintiff cannot possibly show that his non-reappointment was because of his race. There is no evidence that Chancellor Rhee ever knew plaintiff's race, or that she had a policy of replacing African-American school administrators with non-African-American administrators. To the contrary, the record is clear that plaintiff was not reappointed because his school failed to meet federally mandated academic criteria under the No Child Left Behind Act; the District was required to choose from a short list of federally mandated changes in response; and the District chose to replace school leadership, in keeping with federal requirements and as recommended by an advisory team composed of parents of Wilson students and Wilson staff. As a result, and because plaintiff cannot establish municipal liability under Section 1983, the Court should grant summary judgment for the District.

## BACKGROUND

I.   <u>The No Child Left Behind Act</u>

In January 2002, President George W. Bush signed into law the No Child Left Behind Act (NCLBA or Act), which imposed detailed and extensive new requirements

on the District of Columbia (and all 50 states) in exchange for continued federal school funding. *See* Pub. L. 107-110, 115 Stat. 1425 (2002); *id.* at 1516 (specifying District of Columbia).[1] As relevant here, and as of 2007 and 2008, the Act required the District to establish academic achievement standards, using "measurable objectives" for at least mathematics and reading or language arts, that would apply uniformly to all elementary and secondary school students in the District. *See* 115 Stat. at 1444-45, 1448. It further required the District to set a standard for "adequate yearly progress," or AYP, that would result in District-wide proficiency, according to the established achievement standards, by no later than the 2013-2014 school year. *Id.* at 1447-48. It directed the District to set interim goals for adequate yearly progress that would "increase in equal increments" between implementation and the 2013-2014 school year, with the first increase to occur after no more than two years. *Id.* at 1448.

The Act set strict timelines and consequences for schools that failed to meet adequate yearly progress goals. 115 Stat. 1479-1487. Any school that failed to make adequate yearly progress for two consecutive years was to be identified by the District "school improvement," *id.* at 1479, and would need to develop and implement a detailed two-year improvement plan, *id.* at 1480-81. Schools that failed to progress for three consecutive years were additionally mandated to implement at least one

---

[1]     For a general narrative summary of the Act, including the provisions discussed here, *see* Gail McCallion, *et al.*, Congressional Research Service, "K-12 Education: Implementation Status of the No Child Left Behind Act of 2001 (P.L. 107-110)", Mar. 26, 2008 at 14-17 (AYP) and 23-26 (restructuring). The Act was substantially replaced in December 2015 by the Every Student Succeeds Act, hence the use of past tense throughout this brief. *See generally* U.S. Dep't of Education, "Every Student Succeeds Act (ESSA)," https://www.ed.gov/essa?src=ft (last accessed June 25, 2021).

"corrective action" from a list of options in the Act. *Id.* at 1484. Schools that failed to

make adequate progress for four consecutive years (and despite school improvement

and corrective action plans) were to be put into "restructuring." *Id.* at 1485. When a

school was put into restructuring, by no later than the beginning of the next school

year, the District was forced to implement an "alternative governance arrangemen[t]"

for that school. *Id.* The Act specified five alternative-governance options:

> (i) Reopening the school as a public charter school.
>
> (ii) Replacing all or most of the school staff (which may include the principal) who are relevant to the failure to make adequately yearly progress.
>
> (iii) Entering into a contract with an entity, such as a private management company, with a demonstrated record of effectiveness, to operate the public school.
>
> (iv) Turning the operation of the school over to the State educational agency, if permitted under State law and agreed to by the State.
>
> (v) Any other major restructuring of the school's governance arrangement that makes fundamental reforms, such as significant changes in the school's staffing and governance, to improve student academic achievement in the school and that has substantial promise of enabling the school to make adequately yearly progress … .

P.L. 107-110, Sec. 1116 (b)(8)(B), 115 Stat. 1485.

The Act also required the District to develop and agree upon a policy for

involving parents of participating children in, among other things, the process

of "school review" and restructuring described above. 115 Stat. at 1501.

## II.    <u>School Restructuring in the District of Columbia</u>

At the beginning of the 2007-2008 school year, in addition to responding to the

recently passed No Child Left Behind Act, the District was in the early stages of an

attempt to "completely transform" its public school system. *See* Mayor and Superintendent Partnerships in Education: Closing the Achievement Gap: Hearing Before the Comm. on Education and Labor, H. Hrg. 110-102, at 10 (2008) (Statement of Mayor Adrian Fenty) [Fenty Testimony], *available at* https://tinyurl.com/cj83p93r. In 2007, the system served about 50,000 students, operated 144 schools, and "ranked last in math scores and second-to-last in reading scores for all tested urban public school systems on the National Assessment of Educational Progress." *See* On the Path to Great Educational Results for the District's Public Schools?: Hearing Before the Comm. On Homeland Security and Governmental Affairs, S. Hrg. 110-474, at 1 (2008) (Statement of Cornelia M. Ashby, GAO) [Ashby Testimony], *available at* https://tinyurl.com/udce4ya5. A new mayor, Adrian Fenty, took office in January 2007, with a focus on education. *Id.* In June that same year, President Bush signed into law an act of the D.C. Council that "gave the Mayor authority over public schools, including curricula, operations, budget, personnel, and school facilities," and reorganized the central-governance agencies for District schools. *Id.*; *see also*, Public Ed. Reform Amendment Act of 2007, D.C. Act 17-38 (2007); Pub. L. 110-33 (2007).

Soon thereafter, Mayor Fenty selected Michelle Rhee to serve as the District's first "Chancellor." Fenty Testimony, H. Hrg. 110-102 at 10; *id.* at 13 (Statement of Michelle Rhee) (noting, as of testimony in July 2008, service of one year). As Chancellor, Ms. Rhee "se[t] the academic priorities and the curriculum for public schools, and work[ed] with schools in need of improvement under the No Child Left Behind Act … ." Ashby Testimony, S. Hrg. 110-474 at 6. Chancellor Rhee was also

responsible for the ultimate selection of an alternative governance option for schools put into restructuring, Def.'s Statement of Undisputed Material Facts (SUMF) ¶ 4, and had authority to retain or release school principals and assistant principals at the end of each school year, *id.* ¶¶ 2, 3.

Under the requirements of the NCLBA, twenty-seven District schools were put into restructuring in the 2007-2008 school year, including ten high schools. Fenty Testimony, H. Hrg. 110-102 at 11; Ex. D at 11. After entering "restructuring," each of those schools engaged in a process known as "Quality School Review," or QSR. SUMF ¶ 6. The QSR Process was composed of three phases: a "school self-assessment and pre-review work" period, conducted in the Fall of 2007; an "external" visit, conducted in January of 2008; and a "school feedback" period beginning shortly after. Ex. AB at 6; Ex. AA at 6. Among other things, the process required multiple conversations with the principal and "Local School Restructuring Teams" (LSRTs) at each school, including at the very beginning and the end. SUMF ¶ 7.[2] At the end of

---

[2]      LSRTs predate and function independently of the QSR process and the NCLBA. As described in the 2007-2012 contract between the District and the teachers' union, an LSRT is a "consensus group of local school stakeholders (e.g., administrators, Teachers, WTU, representatives, students, parents/guardians, community members, etc.) who are elected or appointed to advise the Supervisor on matters of local school policy, and which shall operate under the guidelines established in the Planning Guide for LSRTs ... ." *See* Collective Bargaining Agreement Between the Washington Teachers' Union and the District of Columbia Public Schools, October 1, 2007-September 30, 2012, at 5-6, *available at* https://tinyurl.com/2e7svw7u. ("Supervisor" is defined as the "administrative head of a School." *Id.* at 7). LSRTs, which are called Local School Advisory Teams today, have existed in the District since 1992. *See* DCPS, School Year 2019-2020 Local School Advisory Team Guidelines, at 4, *available at* https://tinyurl.com/as7fruys.

the process, Chancellor Rhee used the information provided to select an alternative-governance option for each school from among those provided by the NCLBA. *Id.* ¶ 8.

III.   <u>The Non-Reappointment of Kenneth Dickerson</u>

Kenneth Dickerson first began teaching in District schools in the 1993-1994 school year, as a music teacher at a junior high school. Ex. B, Kenneth Dickerson Depo. Tr. (Oct. 17, 2019) at 13:16-14:8. He first became an Assistant Principal in the 2000-2001 school year, at Wilson Senior High School (Wilson), also in the District. SUMF ¶ 15. Under District regulations applicable at the time (and still today), he was appointed to that position for a one-year term. *Id.* ¶ 2. He was subsequently re-appointed at Wilson at the end of each year thereafter, until the end of the 2007-2008 school year. *Id.* ¶ 15.

At the beginning of the 2007-2008 school year, after Wilson failed to make adequate yearly progress on academic proficiency measures for four consecutive years, the District put Wilson into restructuring, *id.* ¶ 5, as required by the No Child Left Behind Act, 115 Stat. 1485. Wilson progressed through the Quality School Review process, described above. SUMF ¶ 6. Ultimately, in May 2008, in the form of a memo to Chancellor Rhee, Wilson's LSRT made five recommendations for change at Wilson, including, among other things, the recruitment of a new principal, and the establishment of "small learning communities for each grade level," with each community assigned its own "Assistant Principal, a guidance counselor, and an attendance counselor that will follow the students through the four-year period." Ex. AC at 2; SUMF ¶ 9. The LSRT stated that "identification of new leadership is the

6

foundation of our restructuring effort … ." Ex. AC at 2. The LSRT further recommended "partial reconstitution of the Wilson staff/function, specifically to include: Assistant Principals, Guidance counseling, Attendance." SUMF ¶ 9; Ex. A ¶ 10. The LSRT felt that such reconstitution would "allow the new principal to establish a new leadership team for the school that will … build the grade-level teamwork that will be essential between each assistant principal and counselor." Ex. AC at 2.

DCPS staff finalized the restructuring plan for Wilson in mid-May of 2008, SUMF ¶ 11, soon after receiving the LSRT's recommendations. After consideration of the information gathered through the QSR process, and meetings with stakeholders, including the LSRT, Chancellor Rhee selected the second alternative-governance options from the NCLBA's list, corresponding to a replacement of school staff relevant to the AYP failures. *Id.* ¶ 12. The final plan provided that all "instructional staff will have the option to reapply if they wish to remain at the school," with "[n]o more than 20% of teachers" to be ultimately replaced. SUMF ¶ 13. The principal would be replaced, and "[o]ther administrators have the option to reapply if they wish to remain at the school." *Id.*; Ex. A ¶ 10; SUMF ¶ 19.

Chancellor Rhee's final restructuring plan for Wilson echoed the LSRT's recommendation. It stated, "[b]oth the school team and the district believe that significant changes in the administrative structure at Wilson Senior High School are necessary," and explained that the new school leader would "work with the district to develop a leadership team focused on addressing the specific needs of the school in relation to restructuring." SUMF ¶ 14. It adopted the LSRT's recommendation to

create grade-level learning communities (and all of its other recommendations), and also envisioned a general flexibility for the new principal to redefine "administrative roles and responsibilities" as needed. Ex. AA at 15, 16.

At the end of the 2007-2008 school year, in keeping with the Wilson restructuring plan, none of the Assistant Principals at Wilson were reappointed for the 2008-2009 school year, including Kenneth Dickerson. SUMF ¶¶ 12, 18. Although he could have reapplied to serve as an Assistant Principal at Wilson for the 2008-2009 school year, he did not do so. *Id.* ¶¶ 13, 19, 20. Plaintiff exercised his retreat rights and served as a DCPS teacher the next school year. Ex. A ¶ 15.

## IV. <u>Procedural History</u>

This action was originally filed on June 30, 2009, in the Superior Court of the District of Columbia, and previously included up to 22 plaintiffs and nine different claims under federal and state law. *See, e.g.*, *Dickerson v. District of Columbia*, 70 F. Supp. 3d 311, 315, 315 n.1, 317 (2014) (Friedman, J.). In 2014, this Court dismissed all of the plaintiffs' claims, except one, for racial discrimination under 42 U.S.C. § 1981. *Id.* at 327. Seventeen plaintiffs and the District filed a joint notice of voluntary dismissal in November 2017. Notice, [65]. The Court dismissed four of the five remaining plaintiffs in January 2018. Order, [69]. The operative complaint, [73] (Fourth Amended), was filed in March 2018 by Mr. Dickerson only, and contains only one count, for violation of 42 U.S.C. §§ 1981 and 1983, *id.* at 13. Mr. Dickerson seeks damages, "[a]ppropriate equitable and declaratory relief," and fees and costs. *Id.*

# LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c). The Court must draw all justifiable inferences in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To prevail, the moving party need only show that the nonmoving party cannot "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also* Fed. R. Civ. P. 56(c)(1)(B). A nonmoving party, however, must establish more than a "mere existence of a scintilla of evidence" in support of his position to overcome a motion for summary judgment. *Anderson*, 477 U.S. at 252. The nonmoving party must present specific facts that would engage a reasonable jury to find in his favor. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## ARGUMENT

## I.    <u>Plaintiff Cannot Show a Violation of Section 1981.</u>

Section 1981 protects the right of "all persons … to make and enforce contracts" without respect to race. The statute defines "make and enforce contracts" to "include the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). "Section 1981 can be violated only by purposeful

or intentional discrimination, and it can encompass employment discrimination ... claims." *Brannum v. Fed. Nat'l Mortg. Ass'n*, 971 F. Supp. 2d 120, 124 (D.D.C. 2013) (citing *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982)).

"To evaluate a section 1981 claim, 'courts use the three-step *McDonnell Douglas* framework for establishing racial discrimination under Title VII." *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014). To survive a motion to dismiss, a plaintiff must allege facts that give rise to an inference of discrimination. *Id.* If the plaintiff succeeds, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action, which the plaintiff can rebut by proving, under a preponderance of the evidence standard, that the employer's justification is merely pretext for discrimination." *Id.* at 1023 (internal quotation marks omitted). *See also, e.g.*, *Figueroa v. Pompeo*, 923 F.3d 1078, 1086-93 (D.C. Cir. 2019) (discussing analysis of *McDonnell Douglas* framework at summary judgment). Ultimately the Court "must resolve [just] one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race ... ?" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

Here, the answer is "no." Mr. Dickerson was not reappointed to his position as the result of a lengthy restructuring process at his school, mandated by federal law. He cannot support the allegations of discrimination in his complaint, and, even if he

could, no reasonable juror could find that Chancellor Rhee chose not to reappoint him because of his race because there is no evidence she knew his race.

A. **The District Had a Legitimate, Non-Discriminatory Reason for Plaintiff's Non-Reappointment.**

In order to satisfy the second prong of the *McDonnell Douglas* framework, the District must meet the standard recently elaborated in *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019), which requires that: (1) the District proffer admissible evidence (or evidence which could be made admissible at trial); (2) the evidence must support a finding that "the employer's action was motivated by a nondiscriminatory reason"; (3) the "nondiscriminatory explanation must be ... facially credible in light of the proffered evidence"; and (4) the evidence must present "a clear and reasonably specific explanation" such that the employee has "a full and fair opportunity to attack the explanation as pretextual."

The District has met that standard: plaintiff's non-reappointment was the result of a categorial decision to non-reappoint the *entire* leadership team at Wilson High School, in effort to comply with federal requirements for restructuring a school that was failing to educate its students. As discussed above, in the 2007-2008 school year, after failing to meet yearly progress goals on academic standards for four consecutive years, Wilson began a federally mandated process called restructuring. SUMF ¶¶ 5, 16; 115 Stat. 1485. Under the No Child Left Behind Act, the District was then required to choose from among five alternative-governance options for the school, all of which required some form of radical change in school leadership. *See* P.L. 107-110, Sec. 1116 (b)(8)(B), 115 Stat. 1485. After a school-year-long process of

11

information gathering and analysis, SUMF ¶¶ 6, 7, Wilson's LSRT recommended, among other things, that Wilson's Assistant Principals be reconstituted as part of the restructuring process, *id.* ¶ 9, and that the position description for the next school year should be redefined, *id.* ¶ 10. After considering the LSRT's recommendations, Chancellor Rhee selected the second NCLBA option, *id.* ¶¶ 8, 12, which required "ii) Replacing all or most of the school staff (which may include the principal) who are relevant to the failure to make adequately yearly progress," *see* 115 Stat. 1485. As a result, plaintiff was not re-appointed as Assistant Principal at Wilson for the following school year (2008-2009).

Courts have routinely found that organizational restructuring, supported by evidence, can be a legitimate, nondiscriminatory, and facially credible reason to remove or redefine a position. *E.g.*, *Patton v. Indianapolis Public Sch. Bd.*, 276 F.3d 334, 336-37 (7th Cir. 2002) (affirming judgment for school district when reliance on third-party recommendation to restructure department and demote plaintiffs was legitimate, nondiscriminatory reason for decision); *Gibbons v. Richmond Cnty Bd. of Ed.*, Civil Action No. 109-130, 2011 WL 1302146, at *1-2, 6-7 (S.D. Ga. Mar. 31, 2011) (affirming judgment for school district when principals at schools that failed to make adequately yearly progress under NCLBA were terminated, upon recommendation of superintendent and state department of education); *Lowe v. District of Columbia*, 669 F. Supp. 2d 18, 30-31 (D.D.C. 2009) (accepting explanation, supported by evidence, that plaintiff's position was abolished as a result of organizational restructuring, and noting that "'[i]f the employer's stated belief about the underlying facts is reasonable

12

in light of the evidence … there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts'") (quoting *Brady*, 520 F.3d at 495 (alterations in *Lowe*)).

Plaintiff has had a full and fair opportunity to attack this explanation as pretextual. He has been aware of these basic facts since the inception of this lawsuit. SUMF ¶ 16. Although he made no mention of the restructuring process in his complaint, in deposition he acknowledged that Wilson was in restructuring in the 2007-2008 school year. *Id.*[3] And, when asked to define restructuring, he answered, "I don't know totally, but that everybody is going to have to I think reapply for their job or something like that." Ex. B at 178:10-20. He further acknowledged that the decision to non-reappoint him "was a blanket move," not the result of individual consideration of his record. *Id.* at 181:14-182:5. He has had more than a decade in which to mount an attack on this explanation as pretextual, but, as discussed below, he cannot show that it is.

---

[3]     Plaintiff does allege, consistent with these facts, that "[i]n late 2007, DCPS officials notified Plaintiff that in addition to the above referenced evaluation criteria, Rhee's office would evaluate and rank school officials at the end of the academic school year based on students' reading and mathematics test scores, attendance, and improvement in various other academic and scholastic areas." Fourth Am. Compl. [73] ¶ 11. He further alleges that "Defendant failed to conduct such evaluation of Plaintiff in the 2007-2008 academic school year." *Id.* There is no evidence that "Rhee's office" in fact promised to evaluate plaintiff, or anyone, on the basis of "the above referenced evaluation criteria," but there is abundant evidence, just discussed, that Rhee's office concluded an evaluation based on academic performance at Wilson in the 2007-2008 school year.

B.   <u>No Reasonable Juror Could Find Plaintiff Was Non-Reappointed Because of His Race.</u>

At the motion to dismiss stage, this Court identified numerous allegations in plaintiff's complaint that, taken together, and taken as true, were sufficient to make out a *prima facie* case of discrimination (that is, to raise an inference of discrimination). *Dickerson v. District of Columbia*, 315 F. Supp. 3d 446, 454-56 (D.D.C. 2018). The discovery process has revealed that these allegations are not true.

More specifically, the Court identified the following material allegations, which are numbered here to facilitate response:

(1) plaintiff identified "similarly situated employees who were not members of the same protected class and not subjected to the same adverse treatment;"

(2) "his position and the positions of other African-American employees similarly terminated were filled largely by employees not belonging to his protected class;"

(3) "a white woman with less education and experience than Mr. Dickerson was selected to fill his position;"

(4) "a white man was selected to fill the vacant Wilson principal position for which Mr. Dickerson believed he was qualified and to which he had hoped to be promoted;"

(5) plaintiff "satisfied any and all Defendants' documented objectives for hiring, keeping and promoting qualified employees;"

(6) "DCPS failed to conduct the required evaluations of his performance during the 2007-08 school year;"

14

(7) "DCPS 'intentional[ly] and deliberate[ly] exclu[ded]' Mr. Dickerson from the reappointment and principal selection processes and instead 'pre-selected non-African-American candidates to fill the principal and assistant principal positions,' without regard to performance history and qualifications." (quoting Pl.'s Opp'n to Def.'s Mot. to Dismiss, [79] at 6).

*Dickerson*, 315 F. Supp. 3d at 454-55.

As an initial matter, nothing in plaintiff's complaint ties these disparate decisions to anyone in particular. *See, e.g.*, [73] ¶ 9 ("Defendant never administered any such evaluations … ."); ¶ 21 ("Defendant's employees and agents surreptitiously interviewed and engaged replacements … ."); ¶ 22 ("Prior to Plaintiff's Notice of non-reappointment, Defendant had already pre-selected its candidates … ."). Arguably, he alleges this was all done at the direction of Chancellor Rhee. *Id.* at ¶¶ 2 ("Defendant acted by and through its prior Chancellor … Rhee and various other DCPS employees and agents … ."); ¶ 11 ("Rhee's office would evaluate and rank school officials at the end of the academic year … ."); ¶ 17 (Rhee made decision not to reappoint plaintiff); ¶ 24 (Rhee "and her designees" hired new principal); *see also*, *Dickerson*, 315 F. Supp. 3d at 457.

Even if all of these allegations were true, and all at the direction of Chancellor Rhee, no reasonable juror could find that plaintiff's non-reappointment was based on his race because there is no evidence Rhee knew his race. "It is axiomatic that a defendant cannot be found to have discriminated against a plaintiff on the basis of race where the defendant had no knowledge of the plaintiff's race." *Washington v.*

15

*Chao*, 577 F. Supp. 2d 27, 40 (D.D.C. 2008) (citing cases from the D.C., Ninth, Second, and Third Circuits).

Moreover, plaintiff's allegations are not true. First, he cannot identify any similarly situated employees who were not African-American. In discovery, plaintiff identified one person in support of this allegation:  Patrick Pope, a white male Principal at Hardy Middle School. Ex. B at 105:13-106:20; SUMF ¶ 21. Mr. Dickerson has no knowledge of Mr. Pope's performance. Ex. B at 105:13-106:20. More importantly, Hardy Middle School was *not* in restructuring in the 2007-2008 school year. SUMF ¶ 22. In fact, it was one of only three middle schools not in any stage of improvement under NCLBA guidelines. Ex. D at 11.

Second, plaintiff cannot show that his position, or "the positions of other African-American employees similarly terminated," were filled by white employees, or by less-qualified employees (corresponding to allegations 2, 3, and 7 above). It is true that one of the Assistant Principals hired at Wilson for the 2008-2009 school year, Mary Beth Waits, was a white female. But, in deposition, when asked "do you think … she was not as qualified as you," plaintiff answered "I wouldn't know her qualifications, sir." SUMF ¶ 23; Ex. B at 139:14-140:21; *see also* Ex. F, Pl.'s Answers to First Set of Requests for Admission, at 4 ("6. Admit that you cannot identify specific facts supporting your allegation in paragraph 24 … that you were replaced by 'Mary Beth Waits, a White female, with less education and experience than Plaintiff. Response to No. 6: Deny. I understood that Ms. Waits came from another jurisdiction and at minimum did not have thorough knowledge of DCPS policies, procedures and

16

curriculum.").[4] Plaintiff further admitted that he did not know how many Assistant Principals, in total, were hired to serve at Wilson in the 2008-2009 school year, SUMF ¶ 24, implying he could not, of course, know how many of them were African-American. In fact, two of the four Assistant Principals selected for the 2008-2009 school year were African-Americans. SUMF ¶ 25; Ex. A 14. Plaintiff further admitted he did not know the race of other administrators newly hired for the 2008-2009 school year at other DCPS schools, or whether they were "less seasoned." SUMF ¶ 26.

Finally, plaintiff's allegations concerning "Defendant's" failure to conduct performance evaluations in the 2007-2008 school year and his qualifications to serve as an Assistant Principal (AP) or Principal (corresponding to allegations 4, 5, 6, and 7 above) are at best misleading because they were irrelevant to his non-reappointment, and plaintiff did not apply to be an AP or Principal in the 2008-2009 school year. It is not true that plaintiff "satisfied any and all Defendants' documented objectives for hiring, keeping and promoting qualified employees," *Dickerson*, 315 F. Supp. 3d at 454, because his school did not satisfy documented NCLBA requirements, and this failure implicated school administrators' performance and retention. SUMF ¶¶ 5, 12. Further, plaintiff acknowledged that any written evaluation for the 2007-2008 school year would have been conducted in late June 2008. *Id.* ¶ 27. This was

---

[4]     In fact, when she was hired at Wilson, Ms. Waits was a retired Principal, had a Master's degree, and had prior experience "work[ing] to get a school out of restructuring." Ex. G, Email from Peter Cahall to Michelle Rhee dated June 26, 2008, at 3. Thus, she had achieved the same degree as plaintiff, had served in a higher-level administrative position, and had direct experience working out of restructuring that plaintiff lacked. *Id.*

17

after DCPS finalized Wilson's restructuring plan in May 2008, *id.* ¶ 11, meaning such an evaluation could not possibly have been taken into account in the non-reappointment decision, even if performance evaluations had been considered.[5] And the content of plaintiff's performance evaluations, or any lack thereof, could not possibly have mattered in the District selection process for administrators for the 2008-2009 school year, because plaintiff did not apply for those positions. *Id.* ¶ 20.

In sum, the District is entitled to judgment on plaintiffs' claim, because he cannot support his allegations with evidence, and, consequently, no reasonable juror could find that he was not reappointed because of his race. *See* Fed. R. Civ. P. 56.[6]

**II.    Plaintiff Cannot Show a Violation of Section 1983 Because He Cannot Show Chancellor Rhee Had a Policy of Replacing African-American Administrators With Non-African-American Administrators.**

Even if plaintiff could show a predicate violation of a federal right—that is, that some District employee somehow interfered with his contractual rights, because of his race—the District is entitled to judgment on plaintiff's claim because he cannot show that the violation was the result of any District custom or policy. *Cf. West v.*

---

[5]    Plaintiff also testified that he did not expect to be evaluated at the end of the 2007-2008 school year. Ex. B, Dickerson Dep. Tr. at 92:1-22; *id.* at 93:7-10 ("Q. Did you expect to be evaluated even though you got the letter of non-reappointment? A. No, sir. I didn't expect to be evaluated once I was terminated, sir."). Plaintiff also did not know if Wilson's (acting) Principal completed *any* evaluations that year. *Id.* at 94:8-10.

[6]    Even if plaintiff could show that Chancellor Rhee knew his race, and even if his factual allegations were true, no reasonable juror could find that he was non-reappointed because of his race in the face of ample evidence, described above, that it was the result of a categorical decision to non-reappoint all of Wilson's administrators that year, in order to comply with NCLBA requirements.

*Atkins*, 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."). "To prevail on a claim under § 1981 against the District [ ] a plaintiff must show that the violation of his right to make contracts protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases." *Hamilton v. District of Columbia*, 720 F. Supp. 2d 102, 114 (D.D.C. 2010) (citations omitted); *see also Brown*, 774 F.3d at 1021-22 (affirming that Section 1983 exclusively provides cause of action for remedy of Section 1981 violations); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (establishing elements of municipal liability under Section 1983). This Court is no doubt familiar with the cognizable forms of liability under *Monell. E.g., Dickerson*, 315 F. Supp. 3d at 456.

In denying the District's motion to dismiss plaintiff's complaint, this Court held plaintiff adequately alleged "a policy of replacing African-American administrators with non-African American administrators within the D.C. public school system, implemented through the actions of Chancellor Rhee." *Id.* at 457. At summary judgment, of course, plaintiff must put forth sufficient evidence for a jury to find the existence, in fact, of such a policy. *See* Legal Standard above. He cannot do so.

As discussed above, plaintiff cannot produce any evidence showing that Chancellor Rhee even knew he was African-American—he similarly cannot produce any evidence showing Chancellor Rhee knew that any other non-reappointed administrators were African-American (or how many), or the race of persons who

19

replaced them. Absent this, no reasonable juror could find that Chancellor Rhee had any knowledge of the racial composition of DCPS administrators, let alone an intention or policy to change it. *E.g.*, *Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987) (affirming summary judgment for defendant on Title VII and Section 1981 claims when "a plaintiff offers proof that he is Black, but there is no showing by direct or indirect evidence that the decision-maker knew this fact"); *Washington*, 577 F. Supp. 2d at 40 (allegedly discriminating officials must know subject's race); *cf. Clark Cnty. Sch. Dist. v. Breen*, 532 U.S. 268, 272 (2001) (allegedly retaliating officials must know about allegedly protected activities).

Even if there were evidence that Rhee was aware of plaintiff's race, and the race of other administrators who were not reappointed that year, and the race of administrators appointed to replace them (none of which plaintiff can show)—and even if it were further true that there were fewer African-American administrators in the 2008-2009 school year than in the 2007-2008 school year (which plaintiff cannot show)—the District would still be entitled to judgment because plaintiff cannot produce any evidence suggesting that any change in the racial composition of school administrators was the result of a policy decision by Chancellor Rhee. For this reason, too, the District is entitled to judgment on plaintiff's claim.

## CONCLUSION

For the foregoing reasons, the Court should grant the District's motion for summary judgment.

Dated:  July 2, 2021.       Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Acting Deputy Attorney General
Public Interest Division

*/s/ Mateya B. Kelley*
MATEYA KELLEY [888219451]
Assistant Attorney General
Equity Section
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
(202) 724-7854
(202) 730-0626 (fax)
mateya.kelley@dc.gov

*Counsel for Defendant*