UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                        )
KENNETH DICKERSON,                      )
                                        )
            Plaintiff,                   )
                                        )
      v.                                 )        Civil Action No. 09-2213 (PLF)
                                        )
DISTRICT OF COLUMBIA,                   )
                                        )
            Defendant.                   )
_____ )
```

OPINION

        Plaintiff Kenneth Dickerson formerly an assistant principal at Woodrow Wilson

High School ("Wilson"), brought this suit against the District of Columbia alleging

discrimination on the basis of race, in violation of Section 1981 of Title 42 of the United States

Code.[1]  On July 26, 2018, this Court denied the District's motion to dismiss Dr. Dickerson's

fourth amended complaint.  See Dickerson v. District of Columbia, 315 F. Supp. 3d 446

(D.D.C. 2018).  Now pending before the Court is Defendant's Motion for Summary Judgment

[Dkt. No. 138], filed on July 2, 2021.  Upon careful consideration of the parties' briefs, the

relevant legal authorities, and the entire record in this case, the Court will grant the District's

summary judgment motion.[2]

---

[1]     Kenneth Dickerson earned his Doctor of Education from George Washington University on May 15, 2011.  See Def. Ex. C – Dickerson Resume [Dkt. No. 138-10] at 3; Pl. Ex. 14 – Dickerson Diploma [Dkt. No. 141-6] at 41.  Although this case involves events that occurred before he earned his doctorate, this Opinion will refer to Kenneth Dickerson as Dr. Dickerson.

[2]     In connection with the pending motion, the Court has reviewed the following filings, including the exhibits attached thereto:  Plaintiff's Fourth Amended Complaint

## I. BACKGROUND

### A. The No Child Left Behind Act

In 2002, President George W. Bush signed the No Child Left Behind Act ("NCLBA") into law.  See No Child Left Behind Act of 2001, Pub. L. No. 107-110, 115 Stat. 1425 (2002) (codified as amended at 20 U.S.C. § 6301, et seq.), amended by Every Student Succeeds Act, Pub. L. No. 114-95, 129 Stat. 1802 (2015).  The NCLBA required each state and the District of Columbia "to implement statewide accountability systems for all public schools and their students, to define education standards, and to establish a system of assessments for measuring whether students have met those standards."  Center for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1153 (D.C. Cir. 2005).  Under the NCLBA, "a school's continued failure to make adequate yearly progress [("AYP")] toward meeting proficiency goals [gave] rise to assistance and intervention."  Id. at 1153-54.

Central to this case, individual schools that failed to meet AYP standards for five consecutive years were required to undergo "restructuring" by implementing one or more "alternative governance" arrangements.  See WAYNE C. RIDDLE ET AL., CONG. RSCH. SERV., RL31284, K-12 EDUCATION: HIGHLIGHTS OF THE NO CHILD LEFT BEHIND ACT OF 2001

---

("Complaint") [Dkt. No. 73]; Defendant's Answer and Defenses to Plaintiff's Fourth Amended Complaint ("Answer") [Dkt. No. 87]; Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Def. Mot.") [Dkt. No. 138-1]; Defendant's Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment ("Def. Facts") [Dkt. No. 138-2]; Def. Ex. A – Declaration of Donielle Powe ("Powe Decl.") [Dkt. No. 138-4]; Def. Ex. AA – Wilson Senior High School Restructuring Plan ("Wilson Restructuring Plan") [Dkt. No. 138-5]; Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp.") [Dkt. No. 141]; Plaintiff's Statement of Material Facts in Dispute ("Pl. Opp. Facts") [Dkt. No. 141-2]; Pl. Ex. 2 – Deposition of Donielle Powe ("Powe Depo.") [Dkt. No. 141-3]; Pl. Ex. 3 – Deposition of Kenneth Dickerson ("Dickerson Depo.") [Dkt. No. 141-4]; Pl. Ex 4 – Declaration of Kenneth Dickerson ("Dickerson Decl.") [Dkt. No. 141-5]; and Defendant's Reply in Support of Motion for Summary Judgment ("Def. Reply") [Dkt. No. 142].

(P.L. 107-110) at 5-6 (2008); see also NCLBA, Pub. L. No. 107-110, § 1116(b)(8)(A), 115 Stat.

at 1485.  The NCLBA enumerated five such arrangements:

> (i)  Reopening the school as a public charter school.
>
> (ii)  Replacing all or most of the school staff (which may include the principal) who are relevant to the failure to make adequate yearly progress.
>
> (iii)  Entering into a contract with an entity, such as a private management company, with a demonstrated record of effectiveness, to operate the public school.
>
> (iv)  Turning the operation of the school over to the State educational agency, if permitted under State law and agreed to by the State.
>
> (v)  Any other major restructuring of the school's governance arrangement that makes fundamental reforms, such as significant changes in the school's staffing and governance, to improve student academic achievement in the school and that has substantial promise of enabling the school to make adequate yearly progress.

NCLBA, Pub. L. No. 107-110, § 1116(b)(8)(B), 115 Stat. at 1485 (emphasis added).  Separately,

the NCLBA required local educational agencies to develop plans for the involvement of parents

in the process of school improvement, including restructuring.  See id. § 1118(a)(2)(A), 115 Stat.

at 1501.

*B.  The Restructuring of Wilson and the Non-Reappointment of Kenneth Dickerson*[3]

Dr. Dickerson, an African-American man, first began teaching at Wilson High

School as a music teacher in September 1996.  See Dickerson Depo. at 15:5-16; Complaint at

---

[3]     To the extent that the District of Columbia argues that Dr. Dickerson has conceded to the District's statement of material facts by failing to provide a counterstatement of genuine issues of material fact, see Def. Reply at 5, the Court disagrees.  In his own statement of material facts in dispute, Dr. Dickerson sets forth his version of the events at issue, see, e.g., Pl. Opp. Facts at ¶¶ 4, 6, 8-10, 12, 19-20, and sufficiently "isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record."  Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 151 (D.C. Cir. 1996) (quoting Gardels v. Cent. Intel. Agency, 637 F.2d 770, 773 (D.C. Cir. 1980)).

¶ 5; Answer at ¶ 5.[4]  In October 1999, he was promoted to the position of dean of students.  See Dickerson Depo. at 15:20-16:20; Pl. Ex. 16 – October 12, 1999 Letter [Dkt. No. 141-7] at 4.  In September 2000, Dr. Dickerson was promoted to the position of assistant principal.  See Complaint at ¶ 6; Answer at ¶ 6; Pl. Opp. Facts at ¶ 15.  He was initially appointed to serve as assistant principal for a one-year term, and until 2008, Dr. Dickerson was reappointed each year to serve an additional one-year term.  Powe Decl. at ¶¶ 5-6; see Pl. Opp. Facts at ¶¶ 15, 17-18.  Dr. Dickerson further asserts that he was Wilson's senior assistant principal and thus was designated to be in charge whenever Wilson's principal was absent.  See Complaint at ¶ 6; Dickerson Depo. at 39:21-41:5.  The District denies this assertion.  See Answer at ¶ 6.  In 2001, Dr. Dickerson received an end-of-year evaluation of "Satisfactory," and in 2002 and 2003, he received end-of-year evaluations of "Outstanding."  See Pl. Ex. 13 – Dickerson Performance Evaluations [Dkt. No. 141-6] at 26-35.  Dr. Dickerson claims that he received evaluations of "Exceeds Expectations" from 2003 through 2007, although those evaluations are missing from his employee file.  See Complaint at ¶ 10; Dickerson Depo. at 88:13-89:11.  He also claims that he did not receive a performance evaluation during the 2007-2008 school year.  Dickerson Depo. at 87:14-16.

During the 2007-2008 school year, Michelle Rhee was the Chancellor of the District of Columbia Public Schools ("DCPS").  Pl. Opp. Facts at ¶ 1; Powe Decl. at ¶¶ 7-8.  In accordance with D.C. law, principals and assistant principals in the DCPS system served in year-long appointments at the discretion of the Chancellor.  See Pl. Opp. Facts at ¶¶ 2-3; D.C. Mun.

_____

[4]        Page number citations to documents that the parties have filed refer to those that the Court's electronic case filing system automatically assigns, except for citations to deposition transcripts, in which case page number citations refer to the original page and line numbers.

Regs. subtit. 5-E, § 520.1-.2 (1997).  Wilson was put into restructuring in the 2007-2008 school year pursuant to the NCLBA because it had failed to meet its AYP goals for five consecutive years.  See Pl. Opp Facts at ¶ 5; Powe Decl. at ¶ 7; see also Def. Ex. AB – Quality School Review Guide ("QSR Guide") [Dkt. No. 138-6] at 3 (noting "full restructuring must occur for the 2008-2009 academic year").  Wilson was one of ten high schools – and one of twenty-seven District of Columbia schools – put into restructuring that academic year.  See Def. Ex. D – School Restructuring Slides ("Restructuring Slides") [Dkt. No. 138-11] at 11.  Dr. Dickerson knew that Wilson was in restructuring by at least February or March 2008.  Pl. Opp. Facts at ¶ 16.

As part of its restructuring, Wilson underwent a Quality School Review ("QSR") process.  See Def. Facts at ¶¶ 6-8; Restructuring Slides at 11-15; see generally QSR Guide at 3-11 (describing the QSR process).  During this process, Wilson stakeholders (including teachers, administrators, students, and parents) assessed the high school along a number of benchmarks in a "school self-assessment."  See QSR Guide at 7.  In addition, an external review team independently assessed Wilson along the same benchmarks and reported their findings to Chancellor Rhee in a comprehensive QSR report.  See QSR Guide at 7-9.  The District asserts that Chancellor Rhee relied in part upon information gathered through this QSR process in making her final restructuring decision for Wilson and in selecting an appropriate alternative governance arrangement mandated by the NCLBA.  See Def. Facts at ¶ 8; Powe Decl. at ¶ 11; Wilson Restructuring Plan at 3 (noting that the final restructuring plan "takes into account student achievement data and results from the [QSR] process").  In response, Dr. Dickerson asserts that this is not true and that Chancellor Rhee did not rely on the QSR review in making her restructuring decision.  See Pl. Opp. Facts at ¶¶ 6, 8.

Also during the 2007-2008 school year, the Wilson Local School Restructuring Team ("LSRT"), a working group composed primarily of Wilson parents and staff, made recommendations to Chancellor Rhee regarding the school's restructuring.  See Def. Facts at ¶ 7; Powe Decl. at ¶ 10; Def. Ex. AC – May 13, 2008 LSRT Memo ("May 13 LSRT Memo") [Dkt. No. 138-7] at 2.  On May 13, 2008, the Wilson LSRT recommended "[b]ring[ing] in a permanent principal with a background of strong educational leadership who is committed to restructuring," and it also recommended partially reconstituting "the Wilson staff/function," including Wilson's assistant principals.  May 13 LSRT Memo at 2.  According to the District, this recommendation advocated the "establish[ment] [of] a new leadership team for the school."  See Def. Facts at ¶¶ 9-10; May 13 LSRT Memo at 2; see also Pl. Ex. 9 – February 2, 2008 LSRT Memo [Dkt. No. 141-5] at 49 (noting that restructuring seemed to permit a new principal "to choose his/her own team of administrators").

Dr. Dickerson disputes this characterization of the recommendation and asserts that Wilson LSRT's recommendation was narrower in scope and recommended only the removal of the school principal.  See Pl. Opp. Facts at ¶¶ 9-10; Powe Decl. at ¶ 10 (noting the Wilson LSRT "recommended the principal be replaced"); see also May 13 LSRT Memo at 16-17 (noting, in the May 13, 2008 LSRT meeting minutes, that "the discussion centered on the functions that we wanted to be reconstituted . . . which we felt were either poorly defined, or carried out by multiple people instead of one individual, or in need of examination by the new principal" (emphasis added)).

On May 15, 2008, Chancellor Rhee and DCPS finalized the Wilson Restructuring Plan.  See Def. Facts at ¶ 11; Def. Ex. E – May 15, 2008 Email [Dkt. No. 138-12] at 2.  The restructuring plan chose to implement the second "alternative governance" arrangement under

the NCLBA to "replac[e] all or most of the school staff (which may include the principal) who are relevant to the failure to make adequate yearly progress."  NCLBA, Pub. L. No. 107-110, § 1116(b)(8)(B)(ii), 115 Stat. at 1485; see also Def. Facts at ¶ 12.  Under the plan, Wilson's "[p]rincipal w[ould] be replaced" and "[o]ther administrators [would] have the option to reapply if they wish[ed] to remain at the school."  Wilson Restructuring Plan at 8; see Powe Decl. at ¶ 11.  The plan noted:  "Both the school team and the district believe that significant changes in the administrative structure at [Wilson] are necessary.  A new school leader will work with the district to develop a leadership team focused on addressing the specific needs of the school in relation to restructuring."  Wilson Restructuring Plan at 15.

In mid-to-late June 2008, Dr. Dickerson was officially notified by mail that Chancellor Rhee had decided not to reappoint him as an assistant principal at Wilson for the 2008-2009 school year.  See Pl. Opp. Facts at ¶ 17; Def. Ex. AD – Dickerson Non-Reappointment Letter ("Non-Reappointment Letter") [Dkt. No. 138-8] at 2.  Similarly, the principal and other assistant principals of Wilson were not reappointed to serve in those positions for the next school year.  See Pl. Opp. Facts at ¶ 18.  The non-reappointment letter stated that DCPS would "honor any valid retreat rights" that Dr. Dickerson possessed, but it did not state that Dr. Dickerson could reapply for his former assistant principal position.  Non-Reappointment Letter at 2.  According to the District, Dr. Dickerson nevertheless knew that he could have reapplied to be an assistant principal at Wilson but did not do so.  Def. Facts at ¶¶ 19-20; see Dickerson Dep. at 178:10-180:8.

Dr. Dickerson asserts that he did in fact reapply to be an administrator at Wilson in June 2016 but was not considered for any administrative position and was later told by DCPS staff that he could not reapply for his assistant principal position.  See Pl. Opp. Facts at ¶¶ 19-20;

Dickerson Decl. at ¶ 14 (asserting that Dr. Dickerson signed "a sign-up sheet for any Wilson personnel interest in remaining at Wilson for the 2008-2009 [school year]" but received no acknowledgement or response after being interviewed); id. at ¶ 15 ("The first week of July 2008 I went to the DCPS HR office and was told by H.R. personnel . . . that I could not apply and would not be considered for any DCPS administrative position.").   He also argues that even if he had been permitted to reapply for his assistant principal position, it would not have made a difference because DCPS had finalized the hiring of his replacement when he was not reappointed.  See Pl. Opp. Facts at ¶ 20; Def. Ex. G – June 27, 2008 Email [Dkt. No. 138-14] at 2-3 (agreeing to the appointment of Mary Beth Waits as an assistant principal of Wilson High School).

On June 30, 2008, Dr. Dickerson was removed as an assistant principal of Wilson. See Complaint at ¶ 17; Answer at ¶ 17.  In fact, none of the assistant principals of Wilson were reappointed that year.  See Pl. Opp. Facts at ¶ 18.  In the coming months, DCPS hired four new assistant principals to serve at Wilson for the 2008-2009 school year, including Mary Beth Waits, a White woman who Dr. Dickerson claims was his replacement.  See Complaint at ¶ 24; Answer at ¶ 24; Powe Decl. at ¶ 14.

*C.  Procedural History*

On June 30, 2009, Dr. Dickerson and twenty-one other former DCPS principals and assistant principals filed this race discrimination lawsuit in the Superior Court of the District of Columbia.  See Notice of Removal [Dkt. No. 1].  On November 20, 2009, the District of Columbia removed the case to this Court.  Over the course of a decade, every plaintiff other than Dr. Dickerson either settled their dispute with the District of Columbia or were dismissed by the Court for failure to prosecute their claim.  See Joint Notice of Voluntary Dismissal [Dkt.

No. 65]; Order [Dkt. No. 69].  On March 13, 2018, as the sole remaining plaintiff in this case,

Dr. Dickerson filed his fourth amended complaint alleging race discrimination.  See Complaint.

On July 26, 2018, this Court denied the District's motion to dismiss Dr. Dickerson's complaint

for failure to state a claim.  See Order [Dkt. No. 83]; Dickerson v. District of Columbia, 315 F.

Supp. 3d at 457.  After the parties failed to resolve their ongoing dispute through mediation and

after several years of discovery, the District moved for summary judgment on July 2, 2021.  See

Defendant's Motion for Summary Judgment [Dkt. No. 138].  The parties have fully briefed the

motion, which is now ripe for resolution.

## II.  LEGAL FRAMEWORK

Rule 56(a) of the Federal Rules of Civil Procedure allows a court to grant

summary judgment on a claim "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a);

see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In ruling on a motion for

summary judgment, "[t]he court must view the evidence in the light most favorable to the

nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility

determinations or weighing the evidence."  Baumann v. District of Columbia, 795 F.3d 209, 215

(D.C. Cir. 2015); see also Student Loan Servicing Alliance v. District of Columbia, 351 F. Supp.

3d 26, 44 (D.D.C. 2018) ("Credibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge at

summary judgment.  Thus, [the Court] do[es] not determine the truth of the matter, but instead

decide[s] only whether there is a genuine issue for trial." (alterations in original) (quoting Barnett

v. PA Consulting Grp., Inc., 715 F.3d 354, 358 (D.C. Cir. 2013))).

"A disputed fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" <u>Breen v. Chao</u>, 253 F. Supp. 3d 244, 253 (D.D.C. 2017) (quoting <u>Talavera v. Shah</u>, 638 F.3d 303, 308 (D.C. Cir. 2011)). And "[a] dispute over a material fact is 'genuine' if it could lead a reasonable jury to return a verdict in favor of the nonmoving party." <u>Id.</u>; <u>see</u> <u>Grimes v. District of Columbia</u>, 794 F.3d 83, 94-95 (D.C. Cir. 2015).

Under the summary judgment standard, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see</u> FED. R. CIV. P. 56(c). In response, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 324; <u>see</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (noting the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" and instead "must come forward with specific facts showing that there is a genuine issue for trial" (internal quotation omitted) (emphasis omitted)).

## III. ANALYSIS

### A. Preliminary Matters

Before reaching the merits of the District's summary judgment motion, the Court will address several preliminary issues that Dr. Dickerson raises. He first contends that the Court should strike the declaration of Donielle Powe, the District's Rule 30(b)(6) witness, because parts of the declaration allegedly were not based upon personal knowledge. <u>See</u> Pl. Opp. at 11;

FED. R. CIV. P. 56(c)(4).  It is established, however, that "if a corporate officer is noticed for deposition pursuant to Rule 30(b)(6), [her] sworn affidavit is admissible, even if that declaration is not based on personal knowledge."  Weinstein v. District of Columbia Housing Authority, 931 F. Supp. 2d 178, 186 (D.D.C. 2013); see also Dickerson v. District of Columbia, Civil Action No. 09-2213, 2021 WL 1840396, at *4 (D.D.C. May 7, 2021) ("30(b)(6) witnesses . . . are not expected to base their testimony on matters entirely within their personal knowledge." (quoting Buie v. District of Columbia, 327 F.R.D. 1, 8 (D.D.C. 2018))).  By designating Ms. Powe as its 30(b)(6) witness, the District had a duty to prepare her to testify on matters known by her as well as those reasonably known by the District.  See Alexander v. F.B.I., 186 F.R.D. 137, 141 (D.D.C. 1998) (citing FED. R. CIV. P. 30(b)(6)).  Dr. Dickerson has provided no reason to believe that Ms. Powe was inadequately prepared on the subjects outside of her personal knowledge to which she testified, and the Court will not exclude her declaration on this basis.

Next, Dr. Dickerson argues that Ms. Powe's declaration should be stricken because it was filed after she was deposed and contradicts her prior deposition testimony.  See Pl. Opp. at 12.  It is established that a party "cannot create or resurrect a genuine issue of material fact" – thereby bolstering its argument against summary judgment – "by filing a self-serving affidavit [or declaration] that contradicts previous sworn testimony."  Thompson v. Islam, Civil Action No. 01-0585, 2005 WL 3262926, at *3 (D.D.C. July 29, 2005) (citing Pyramid Sec. Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1123 (D.C. Cir. 1991)); see 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2726.1 (4th ed. 2021).  "[T]he objectives of summary judgment would be seriously impaired if the district court were not free to disregard" the later-filed, contradictory statement.  Reetz v. Jackson, 176 F.R.D. 412, 414 (D.D.C. 1997) (quoting Pyramid Sec. Ltd. v.

IB Resolution, Inc., 924 F.2d at 1123).  "Thus, on summary judgment, a district court may strike or disregard a party's . . . affidavit if it contradicts his or her own prior sworn deposition testimony."  Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv., 815 F. Supp. 2d 148, 163 (D.D.C. 2011).  But see Galvin v. Eli Lilly & Co., 488 F.3d 1026, 1030 (D.C. Cir. 2007) (noting the court may consider the later-filed, contradictory statement if "the 'shifting party can offer persuasive reasons for believing the supposed correction' is more accurate than the prior testimony" (quoting Pyramid Sec. Ltd. v. IB Resolution, Inc., 924 F.2d at 1123)).

      Contrary to Dr. Dickerson's view, Ms. Powe's deposition testimony and declaration are not in conflict.  At her deposition, Ms. Powe testified that "[t]he reasoning for Mr. Dickerson's non-reappointment was based on the recommendation from the LSRT to remove the school leadership team."  Powe Depo. at 24:11-20.  Dr. Dickerson suggests that Ms. Powe's declaration contradicts this prior statement by stating that the decision not to reappoint Dr. Dickerson was not based solely on the LSRT's recommendation but also on information gathered through the QSR process.  See Pl. Opp. at 12; Powe Decl. at ¶ 11; see supra Section I.B. Far from being "clearly contradictory" to her prior "clear answers to unambiguous questions," 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2726.1, Ms. Powe's declaration merely elaborates that Chancellor Rhee relied on multiple, not singular, sources of information when deciding not to reappoint Dr. Dickerson and the other assistant principals.  See also Pl. Ex. 8 – November 13, 2007 LSRT Memo [Dkt. No. 141-5] at 27-28 (noting, in LSRT meeting minutes, that the LSRT was one of several bodies responsible for assessing and providing recommendations for Wilson during its restructuring).  The Court therefore will not strike Ms. Powe's declaration on this basis.  See Galvin v. Eli Lilly & Co., 488 F.3d at 1030 ("If

the supplemental affidavit does not contradict but instead clarifies the prior sworn statement, then it is usually considered admissible.").[5]

Finally, Dr. Dickerson argues that the Court should impose sanctions on the District for failing to preserve several years' worth of his performance evaluations.  See Pl. Opp. at 13-15; see also Dickerson Decl. at ¶ 12 (noting that the end-of-year annual performance evaluations "for each school year starting 2003-2004 through 2006-2007 were missing" from Mr. Dickerson's personnel file).  Rule 37(e) of the Federal Rules of Civil Procedure provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A) presume that the lost information was unfavorable to the party;
> > >
> > > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> > >
> > > (C) dismiss the action or enter a default judgment.

FED. R. CIV. P. 37(e) (emphasis added).

---

[5]       Interestingly, the District argues that Dr. Dickerson's declaration, filed after his deposition was completed, should also be stricken on similar grounds because it contradicts his prior sworn testimony in certain respects.  See Def. Reply at 6-8 (noting that Dr. Dickerson asserted in his declaration that he had reapplied for his position, but also noting that he had previously testified in his deposition that he had not).  The Court need not address this dispute because, as discussed below, whether Dr. Dickerson was permitted to or did in fact reapply for the position of assistant principal is not a material fact for purposes of summary judgment.  See infra Section III.C.4.

As explained below, the undisputed evidence shows that Dr. Dickerson's annual performance evaluations were irrelevant to Chancellor Rhee's decision not to reappoint him as assistant principal at Wilson.  See infra Section III.C.2.  Thus, even assuming that the District failed to properly preserve Dr. Dickerson's performance evaluations – a claim the District contests, see Def. Reply at 11 n.5 – doing so did not cause any prejudice to the plaintiff.  See FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment ("An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation."); see also Borum v. Brentwood Village, LLC, 332 F.R.D. 38, 47 (D.D.C. 2019) ("Prejudice range[s] along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof." (alteration in original) (internal quotation omitted)).  In addition, Dr. Dickerson does not claim that the District "acted with the intent to deprive" him of the use of his performance evaluations in the litigation.  FED. R. CIV. P. 37(e)(2).  The Court concludes that no sanctions are warranted.

### B.  Whether the District Employed a Policy or Practice

Dr. Dickerson's sole claim in this case is brought pursuant to 42 U.S.C. § 1981. Therefore, in addition to arguing that the District is entitled to summary judgment on the merits of Dr. Dickerson's race discrimination claim, see infra Section III.C, the District argues that it should prevail because Dr. Dickerson has failed to demonstrate that his non-reappointment was the result of any District custom or policy, a prerequisite to relief under Section 1981.  See Def. Mot. at 18-20.

 "Section 1981 'protects the equal right of all persons within the jurisdiction of the United States to make and enforce contracts,' including contracts for employment, 'without respect for race.'"  Hamilton v. District of Columbia, 852 F. Supp. 2d 139, 146 (D.D.C. 2012)

(quoting Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 474-75 (2006)).  Section 1981,

however, "does not itself provide an independent remedy against state actors."  Olatunji v.

District of Columbia, 958 F. Supp. 2d 27, 32 (D.D.C. 2013) (citing Jett v. Dallas Indep. Sch.

Dist., 491 U.S. 701, 733 (1989)).  To obtain relief for a violation of the rights guaranteed by

Section 1981 from a municipality, a plaintiff must bring a claim under 42 U.S.C. § 1983 for the

"deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  Jett

v. Dallas Indep. Sch. Dist., 491 U.S. at 735.  And to do so, a plaintiff must meet the requirements

for municipal liability set forth in Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 691

(1978).  See Olatunji v. District of Columbia, 958 F. Supp. 3d at 32; see also Onyeanusi v.

District of Columbia, 69 F. Supp. 3d 106, 107 (D.D.C. 2014) (granting summary judgment to

defendant on plaintiff's Section 1981 claim because plaintiff "assert[ed] no claim for municipal

liability").

         To establish municipal liability under Monell, a plaintiff must demonstrate that

the municipality acted in accordance with a "government's policy or custom, whether made by

its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."

Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. at 694; see also Olatunji v. District of

Columbia, 958 F. Supp. 2d at 32 ("Monell rejects a respondeat superior theory of municipal

liability; the District cannot be held liable simply because it employs a wrongdoer.")  Such a

policy or custom "must be an 'affirmative link' that served as the 'moving force' behind the

violation."  Al-Kharouf v. District of Columbia, 498 F. Supp. 3d 79, 86 (D.D.C. 2020) (quoting

Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003)).

         The District argues that Dr. Dickerson has failed to satisfy this requirement

because he has not produced any evidence showing that any change in the racial composition of

school administrators at Wilson was due to a municipal policy or custom.  See Def. Mot. at 20.

The Court disagrees.  A plaintiff may establish municipal liability under Monnell, among several

other ways, by demonstrating that the action complained of was made "by a policy maker within

the government."  Baker v. District of Columbia, 326 F.3d at 1306; see City of St. Louis v.

Prapotnik, 485 U.S. 112, 123 (1988) ("[A]n unconstitutional governmental policy [can] be

inferred from a single decision taken by the highest officials responsible for setting policy in that

area of the government's business."); see also Pembaur v. City of Cincinnati, 475 U.S. 469, 480

(1986) ("[I]t is plain that municipal liability may be imposed for a single decision by municipal

policymakers under appropriate circumstances.").  For purposes of this rule, a policymaker is one

who has final policymaking authority under state law.  See Triplett v. District of Columbia, 108

F.3d 1450, 1453 (D.C. Cir. 1997).

   Here, it is undisputed that Chancellor Rhee made the ultimate decision not to

reappoint Dr. Dickerson as assistant principal at Wilson for the 2008-2009 school year.  See Pl.

Opp. Facts at ¶ 17; Non-Reappointment Letter at 2.  And it is also undisputed that Chancellor

Rhee had the authority to reappoint – or to decline to reappoint – principals and assistant

principals at the end of their terms and to set employment policy for DCPS administrators.  See

Pl. Opp. Facts at ¶ 3; D.C. Mun. Regs. subtit. 5-E, § 520.1-.2 (1997); D.C. Code § 38-174(a), (c)

(designating the Chancellor as the "chief executive officer of DCPS" and conferring the powers

and responsibilities of office); see also Dickerson v. District of Columbia, 315 F. Supp. 3d

at 456-57 (noting that D.C. municipal regulations conferred various responsibilities on the

Chancellor, including "the authority to take all personnel actions affecting those employees . . .

under . . . her supervision and control").  Thus, Chancellor Rhee was a policymaker acting with

final policymaking authority when she chose not to reappoint Dr. Dickerson, see Triplett v.

District of Columbia, 108 F.3d at 1453, and her actions were sufficient to establish a municipal

custom or policy under Monell.  See, e.g., Dave v. D.C. Metro. Police Dep't, 905 F. Supp. 2d 1,

12 (D.D.C. 2012) (finding the Chief of Police was the final policymaker as to employment

matters); Banks v. District of Columbia, 377 F. Supp. 2d 85, 91 (D.D.C. 2005) (finding the

Department of Health Director was the final policymaker as to employment matters).  The

District may be held liable under 42 U.S.C. § 1981 for the actions of Chancellor Rhee.

   *C.  Whether Dr. Dickerson Rebutted the District's Legitimate, Nondiscriminatory Reason*

    Turning to the merits of Dr. Dickerson's sole claim in this case, the District

argues that it is entitled to summary judgment because there is no genuine dispute as to any

material fact to support the claim.

    1.  Analysis Under the McDonnell Douglas Framework

    Section 1981 "prohibits racial discrimination with respect to the right of '[a]ll

persons within the jurisdiction of the United States . . . to make and enforce contracts,' including

contracts for employment."  Lattisaw v. District of Columbia, 118 F. Supp. 3d 142, 155

(D.D.C. 2015) (quoting 42 U.S.C. § 1981(a)) (citing Domino's Pizza, Inc. v. McDonald, 546

U.S. at 474-75 (2006)).  Section 1981 "can be violated only by purposeful [or intentional]

discrimination."  Brannum v. Fed. Nat'l Mortg. Ass'n, 971 F. Supp. 2d 120, 124 (D.D.C. 2013)

(alteration in original) (quoting Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391

(1982)).  To prevail on a Section 1981 claim, "a plaintiff must . . . ultimately prove that, but for

race, it would not have suffered the loss of a legally protected right."  Comcast Corp. v. Nat'l

Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1019 (2020); accord Yazzie v. Nat'l Org. for

Women, Civil Action No. 19-3845, 2021 WL 1209347, at *12 (D.D.C. Mar. 20, 2021).

Absent direct evidence of discrimination, courts analyze Section 1981 race discrimination claims using the familiar three-step McDonnell Douglas framework.  See Carney v. Am. Univ., 151 F.3d 1090, 1092-93 (D.C. Cir. 1998) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 & n.13 (1973); see also Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1553 (D.C. Cir. 1997) ("The burdens of persuasion and production for claims raised under § 1981 . . . are identical to those for claims alleging discriminatory treatment in violation of Title VII.").  Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of racial discrimination.  See Said v. Nat'l R.R. Passenger Corp., 317 F. Supp. 3d 304, 320 (D.D.C. 2018).  Upon doing so, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."  Id. (alterations in original) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. at 802).  If the defendant does so, the McDonnell Douglas framework falls away and the "one central inquiry" becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis."  Hamilton v. Geithner, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quoting Adeyemi v. District of Columbia, 666 F.3d 1344, 1351 (D.C. Cir. 2008)); see Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 576 (D.C. Cir. 2013) (per curiam); Wilson v. DNC Servs. Corp., 417 F. Supp. 3d 86, 92 (D.D.C. 2019), aff'd, 831 F. App'x 513 (D.C. Cir. 2020) (per curiam); Howard v. Fed. Express Corp., 316 F. Supp. 3d 234, 242 (D.D.C. 2018).  "The employee can survive summary judgment by providing enough evidence for a reasonable jury to find that the employer's proffered explanation was a pretext for retaliation or discrimination."  Morris v. McCarthy, 825 F.3d 658, 668 (D.C. Cir. 2016).

The District asserts that Dr. Dickerson was not reappointed as assistant principal because "of a categorical decision to non-reappoint the <u>entire</u> leadership at Wilson High School, in [an] effort to comply with federal requirements for restructuring a school that was failing to educate its students." Def. Mot. at 13. Dr. Dickerson does not dispute that a restructuring can constitute a legitimate, nondiscriminatory reason for an employee's non-reappointment. <u>See</u>, <u>e.g.</u>, <u>Brandli v. Micrus Endovascular Corp.</u>, 209 F. Supp. 3d 356, 361 (D.D.C. 2016) (finding that terminating employees because of a budget-driven reduction of the employer's sales force was a legitimate, nondiscriminatory reason for terminating plaintiff); <u>Edmonds v. Engility Corp.</u>, 82 F. Supp. 3d 337, 341-42 (D.D.C. 2015) (finding that terminating employees "as part of the company's larger reorganization" was a legitimate, nondiscriminatory reason for terminating plaintiff). Rather, he asserts that in this case such a reason was a pretext for discrimination. <u>See</u> Pl. Opp. at 15-16. Because the defendant has proffered a legitimate, nondiscriminatory reason for its allegedly discriminatory action, the Court turns directly to the central issue: Has Dr. Dickerson produced sufficient evidence from which a reasonable jury could find that the District's stated reason for not reappointing him was not the actual reason for the non-reappointment and that the District instead intentionally discriminated against him on the basis of race? <u>See</u> <u>Brady v. Off. of the Sergeant at Arms</u>, 520 F.3d 490, 494-95 (D.C. Cir. 2008); <u>Wilson v. DNC Servs. Corp.</u>, 417 F. Supp. 3d at 92-93.

## 2. Whether Not Reappointing Dr. Dickerson Without Considering His Individual Qualifications Demonstrates Pretext

Dr. Dickerson first argues that the District's explanation is pretextual because the decision not to reappoint him was made without considering his individual qualifications, his record of performance, or even whether he was "relevant to [Wilson's] AYP failure." Wilson

Restructuring Plan at 8; see Pl. Opp. at 16-21.  He maintains that the District and Chancellor

Rhee disregarded applicable DCPS employment policies and procedures by failing to conduct an

individualized assessment of Dr. Dickerson's fitness to continue serving as an assistant principal

at Wilson.  See Pl. Opp. at 18-19.  But this does not support an argument of pretext.  Rather, it is

consistent with the District's proffered legitimate, nondiscriminatory reason, namely, that

Chancellor Rhee made a categorical, across-the-board decision to remove the entire

administrative leadership of Wilson because of the failure of Wilson to meet its AYP goals for

five consecutive years while under their watch.  See Wilson Restructuring Plan at 8 (choosing

Restructuring Option 2B "Instructional Staff Reconstitution": "Replace school staff relevant to

AYP failure").

   As noted above, the NCLBA required Wilson to be put into restructuring, which

in turn required the District to select an alternative governance arrangement to rescue the school

from its continued underperformance.  See supra Section I.A; Pl. Opp. Facts at ¶¶ 4-5.  Having

been given a range of options by the NCLBA, Chancellor Rhee decided to replace the Wilson

administrators who were in charge when Wilson failed to meet its AYP goals, and she based her

decision on the recommendations of the Wilson LSRT "to remove the [Wilson] leadership team

as a whole."  Powe Depo. at 26:8.  Although Dr. Dickerson argues that his individual

performance evaluations and credentials suggest that he was an exceptional school administrator,

see Pl. Opp. at 6, it is undisputed that he was an assistant principal at Wilson while it consistently

fell short under the NCLBA's standards.  Dr. Dickerson offers no response to the government's

assertion that his individual performance – even if it had been exceptional – was irrelevant to the

ultimate non-reappointment decision in light of the overriding fact that he and his fellow Wilson

administrators oversaw and failed to correct the school's continuing underperformance.  Powe Decl. at 24:21-26:8.

It follows that no reasonable juror could find that Chancellor Rhee's non-reappointment decision was actually "based on the relative qualifications of the applicants" for the assistant principal position, Washington v. Chao, 577 F. Supp. 2d 27, 43-44 (D.D.C. 2008), instead of the fact that the non-reappointed administrators were in charge when Wilson was put into restructuring for consistently failing to meet its AYP goals.  See George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005) (noting that "performance below the employer's legitimate expectations" is a "legitimate reason[] for discharge").[6]  Dr. Dickerson's qualifications-based arguments therefore are off the mark and do not raise a genuine issue of material fact that the District's non-reappointment decision was the result of race discrimination.  See Mitchell v. Nat'l R.R. Passenger Corp., 407 F. Supp. 2d 213, 232, 236-37 (D.D.C. 2005) (granting summary judgment where the evidence reasonably suggested that the plaintiff's termination was due to company-wide restructuring).  But see Brown v. Howard Univ. Hosp., 172 F. Supp. 3d 187, 192-96 (D.D.C. 2016) (denying summary judgment where there was little evidence that the defendant engaged in restructuring, other than eliminating plaintiff's position).

3.  Whether the Appointment of Mary Beth Waits as Assistant Principal Demonstrates Pretext

Dr. Dickerson next argues that the District's stated reason is pretextual because he was replaced as an assistant principal by Mary Beth Waits, a White woman.  See Pl. Opp. at 16, 20-22.  It is established that "[a] plaintiff may prove that an employer had a discriminatory

---

[6]        Thus, even assuming Chancellor Rhee had previously met Dr. Dickerson and knew his race, see Dickerson Decl. at ¶ 13, Dr. Dickerson has provided no evidence to suggest that the non-reappointment decision was based on selection criteria other than his involvement as a school administrator in Wilson's persistent underperformance and placement in restructuring.

motive by producing 'evidence suggesting that the employer treated other employees of a different race . . . more favorably in the same factual circumstances.'" Howard v. Fed. Express Corp., 316 F. Supp. 3d at 243 (quoting Brady v. Office of the Sergeant at Arms, 520 F.3d at 495); Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1115 (D.C. Cir. 2016) (noting that a plaintiff may support an inference of pretext by showing "the employer's better treatment of similarly situated employees outside the plaintiff's protected group" (quoting Walker v. Johnson, 798 F.3d 1085, 1092 (D.C. Cir. 2015))). "A person is similarly situated to the plaintiff if he or she possesses all the relevant characteristics the plaintiff possesses except for the characteristic about which the plaintiff alleges discrimination." Wilson v. DNC Servs. Corp., 417 F. Supp. 3d at 93 (quoting Lucke v. Solsvig, 912 F.3d 1084, 1087 (8th Cir. 2019)). Although the question of whether employees are similarly situated "ordinarily presents a question of fact for the jury, . . . if a reasonable jury would be unable to find that the plaintiff and the comparator were similarly situated, the court may decide, as a matter of law, that the two are not similarly situated." Burton v. District of Columbia, 153 F. Supp. 3d 13, 67-68 (D.D.C. 2015) (quoting George v. Leavitt, 407 F.3d at 414-15).

Here, although Ms. Waits is of a different race from Dr. Dickerson, plaintiff has proffered no evidence that she was similarly situated to him. A comparator "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them." Ey v. Office of Chief Admin. Officer of U.S. House of Representatives, 967 F. Supp. 2d 337, 345 (D.D.C. 2013) (quoting Wilson v. LaHood, 815 F. Supp. 2d 333, 338-39 (D.D.C. 2011)). Ms. Waits had no previous affiliation with Wilson High School, and she was not an administrator at Wilson when it consistently failed to meet its

AYP goals and was put into restructuring.  See Complaint at ¶ 24; see also Dickerson Depo.

at 139:14-140:15 (noting Ms. Waits had experience as a middle school administrator in

Maryland).  Indeed, Ms. Waits was hired because she was an outsider with prior experience

helping a school out of restructuring.  Def. Ex. G – June 27, 2008 Email [Dkt. No. 138-14]

at 2-3.  Simply put, Ms. Waits did not have the same – let alone any – role or responsibilities at

Wilson High School before Dr. Dickerson's non-reappointment.  She was not similarly situated

to him.  See White v. Tapella, 876 F. Supp. 2d 58, 70 (D.D.C. 2012) (finding that the proffered

comparator and the plaintiff were not similarly situated because they "did not hold the same

positions").  But see Wheeler v. Georgetown Univ. Hosp., 812 F.3d at 1116 (finding that a jury

could reasonably conclude that nurses working in the same or a comparable unit as the plaintiff

were similarly situated to the plaintiff).  Ms. Waits' appointment does not demonstrate pretext.[7]

    4. Whether Preventing Dr. Dickerson from Reapplying for His Position Demonstrates Pretext

                    Finally, Dr. Dickerson argues that the District precluded him from reapplying for

his position as Assistant Principal, exhibiting racial animus.  See Pl. Opp. at 17-18, 21-23.  The

District maintains that under the restructuring plan "all of the Assistant Principals would have to

reapply for their jobs [after being non-reappointed] if they wanted to stay on under the new

---

[7]        Dr. Dickerson has not identified any other comparators that evince pretext.  In his answers to the District's interrogatories, Dr. Dickerson offered only one example of a White DCPS administrator – Patrick Pope, the principal of Hardy Middle School – who he argued was similarly situated and reappointed at the end of the school year.  See Pl. Ex. 18 [Dkt. No. 141-7] at 25; see also Def. Ex. F [Dkt. No. 138-13] at 4.  But, as Dr. Dickerson concedes, Hardy Middle School was not in restructuring in the 2007-2008 school year and therefore was not required to select alternative governance arrangements as Wilson was required to do.  Pl. Opp. Facts at ¶¶ 21-22; see also Restructuring Slides (noting Hardy Middle School was "not placed in [any] improvement status").  Thus, Dr. Dickerson and Mr. Pope were not in similar factual circumstances, and Mr. Pope's reappointment does not suggest that Dr. Dickerson was not reappointed for racially discriminatory reasons.

[principal] and under the new plan."  Powe Decl. at ¶ 11; <u>see</u> Wilson Restructuring Plan at 8; <u>see also</u> <u>id</u>. Powe Decl. at ¶ 10 (noting the Wilson LSRT recommended that the entire school leadership team "be replaced or reconstituted, meaning administrators could reapply for their position").  Yet the non-reappointment letter nowhere states that Dr. Dickerson could reapply for his position, <u>see</u> Non-Reappointment Letter at 2, and Dr. Dickerson avers that he was explicitly instructed by DCPS human resources personnel that he "could not apply and would not be considered for any DCPS administrative position," Dickerson Decl. at ¶ 15; <u>see</u> Pl. Ex. 15 [Dkt. No. 141-6] at 44.  In addition, the parties dispute whether Dr. Dickerson in fact applied for an administrator position at Wilson for the 2008-2009 school year.  <u>Compare</u> Powe Decl. at ¶ 13 ("Mr. Dickerson did not reapply to serve at Wilson for the next year."), <u>with</u> Dickerson Decl. at ¶ 14 (asserting that Dr. Dickerson signed a "sign-up sheet for any Wilson personnel interested in remaining at Wilson" and was interviewed by DCPS personnel), <u>and</u> Pl. Opp. Facts at ¶ 20 ("[P]rior to termination in June 2008, Dr. Dickerson had applied and was already in the DCPS pool of eligible candidates to serve in a Principal capacity during the 2008-2009 SY.").

      Although there appear to be genuine disputes of fact regarding whether Dr. Dickerson was afforded the opportunity to reapply for a position at Wilson after he was not reappointed and whether Dr. Dickerson in fact reapplied, the Court finds that these are not genuine disputes of <u>material</u> fact that withstand summary judgment.  See <u>Breen v. Chao</u>, 253 F. Supp. 3d at 253 ("A disputed fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" (quoting <u>Talavera v. Shah</u>, 638 F.3d at 308)).  As discussed above, the undisputed evidence shows that Chancellor Rhee decided to replace the entire Wilson leadership team because they were in charge when Wilson failed to meet its AYP goals under the NCLBA. Even if DCPS prevented Dr. Dickerson and other recently non-reappointed administrators from

reapplying for their former positions weeks later, doing so would be consistent with that decision.  Indeed, Dr. Dickerson has not identified any other Wilson administrator who was not reappointed but nevertheless was permitted to reapply for their old position.  Moreover, Dr. Dickerson does not otherwise explain how being prevented from reapplying to his position establishes pretext or demonstrates that the District's personnel decision was racially discriminatory.

## IV.  CONCLUSION

For the reasons set forth in this Opinion, the Court will grant the District of Columbia's motion for summary judgment.  An order consistent with this Opinion shall issue this same day.

SO ORDERED.

_____/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  March 3, 2022